UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NICKIE VLADO,

>Plaintiff/Counter-
>Defendant,

-against-

CMFG LIFE INSURANCE COMPANY,

>Defendant/Counter-
>Claimant.

23-CV-3234 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Nickie Vlado brings this lawsuit seeking payment of life insurance benefits. The Insurance Policy (as defined below) is for the life of Vlado's mother, Sally Green. The Policy contains a provision stating that the Policy becomes incontestable after two years of its issuance, except, if permitted by state law, in the case of fraud. Four years after the issuance of the Policy, Sally Green died, and Vlado sought payment of the insurance benefits. CMFG Life Insurance Company then performed an investigation into Green and discovered misrepresentations about Green's medical history and alleged misrepresentations about who completed the Policy application. CMFG subsequently refused to pay the benefits. Vlado initiated this action for breach of contract and declaratory judgment. Vlado also brings claims for fraud and consumer fraud, alleging that CMFG had a fraud alert on Green's Policy for years, but concealed and lied about this alert to induce the continued payment of premiums. CMFG Life Insurance Company brings a counterclaim under the New Jersey Insurance Fraud Prevention Act, contending that Vlado's misrepresentations about the Policy and the Application amount to fraud.

CMFG moves for summary judgment on the breach of contract and declaratory judgment claims, as well as the counterclaim. CMFG seeks dismissal of the fraud and consumer fraud

claims. Vlado cross-moves for partial summary judgment on the breach of contract and declaratory judgment claims and seeks dismissal of the counterclaim. For the reasons stated herein, Vlado's motion is DENIED. CMFG's motion is GRANTED with respect to the breach of contract and declaratory judgment claims and the fraud and consumer fraud claims, but DENIED with respect to the counterclaim.

## BACKGROUND

### I.    Factual Background

Plaintiff and Counterclaim-Defendant Nickie Vlado is the youngest daughter of Sally Green ("Green"), deceased. ECF No. 96 ("Joint Statement of Material Facts" or "JSMF") ¶ 1. Vlado is the named beneficiary of a $300,000 term life insurance policy (the "Policy" or "Green Policy"), issued by Defendant and Counterclaim-Plaintiff CMFG Life Insurance Company ("CMFG"). JSMF ¶ 2.

#### A.  The Policy Application and Incontestability Clause

On August 25, 2018, the Policy's application (the "Application") was submitted electronically, identifying Green as the applicant and purporting to bear her electronic signature. *Id.* ¶¶ 8–9. The Application listed Green's correct date of birth and social security number, as well as a phone number, an email address of cynthiapetro59@gmail.com, a physical address at Nottingham Way in New Jersey, and a Citibank checking account for payment of monthly premiums. *Id.* ¶¶ 10–11.

The Application also contained questions about Green's health and medical condition, including whether Green was "unable to work or perform normal activities due to a chronic illness or permanent injury"; whether Green "within the past 5 years, [had] been treated for or diagnosed by a medical professional with" certain specified health and medical conditions; and

whether Green had "used any form of tobacco, including nicotine substitutes, in the last 12 months." *Id.* ¶ 13 (cleaned up). The "No" box was checked in response to all questions relating to Green's health and medical condition, including nicotine usage. *Id.* ¶ 14.

CMFG's web data and electronic records indicate that the Application was submitted by an iPhone located in West Orange, New Jersey, and not from the Nottingham Way address. *Id.* ¶ 19. Data also showed that the same web page visitor who submitted the Application also created or attempted to create at least eight other life insurance policies on seven individuals other than Green between August 13 and August 25, 2018. *Id.* ¶ 20.

Nonetheless, on August 25, 2018, CMFG issued the Policy based on the information in the Application, with Green as the designated owner. *Id.* ¶¶ 21–22. The Policy contains an incontestability clause:

> This policy is incontestable after it has been in force during [Green]'s lifetime for two years from the effective date or reinstatement date. Statements made in the application or reinstatement application will not be used by us to void your policy or challenge a claim, unless the statement is material, is contained in your application that is attached to your policy, and within the contestable period.

> After this 2-year period, we cannot contest coverage except for: a) Non-payment of premiums; or b) Fraud in the procurement of the policy or reinstated period, if permitted by applicable law in the state where the policy is delivered.

ECF No. 96-11 § 8.02.

## B. CMFG's 2019 to 2020 Investigations and Fraud Suspicions

In early 2019, CMFG's Web Analytics team identified multiple life insurance applications stemming from the same device and providing what the team believed to be intentionally misleading information by altering details such as the name, address, date of birth, and social security number of the supposed applicant. JSMF ¶ 26. Most of these applications were for Simplified Issue Term policies like the Green Policy, for individuals aged between 45

and 65 like Green, and with amounts near the maximum available coverage of $300,000 like the Green Policy. *Id.*

In 2019, CMFG began to investigate these policies and sought advice from the New Jersey Department of Insurance on how to report concerns about a potential fraud ring. *Id.* ¶¶ 27–28. On November 8, 2019, CMFG advised the state department that the Green Policy might have "Possible Fraud Ring Connections." *Id.* ¶ 30 (internal citation omitted). In reference to this letter, CMFG stated in discovery that it "suspected the Policy . . . [wa]s connected to" the fraud ring, but that it had not yet determined the Policy was part of the Fraud Ring as of that time. *Id.* ¶ 31 (cleaned up). The basis for CMFG's suspicions was that the email and physical address in the Application also appeared in other applications and policies that CMFG suspected were fraudulent. *Id.* ¶ 32.

From February to late June 2019, CMFG received three notices that letters confirming receipt of premium payments were undeliverable to the Nottingham Way address in the Green Policy. *Id.* ¶ 34. On or around July 1, 2019, a CMFG contact center representative, Susan Sands, informed another CMFG contact center representative, Ronda Hardy, that a fraud note appeared as Ms. Sands attempted to collect payment from Vlado on the Policy. *Id.* ¶ 35. Hardy then observed that there was "some returned mail" associated with the policy. *Id.* ¶ 36 (internal citation omitted).

On July 29, 2019, CMFG entered a fraud note ("Fraud Note") with respect to the Policy into Salesforce, the system that CMFG call center representatives use to administer policies. *Id.* ¶ 37. The Fraud Note appeared on the homepage of the Policy in Salesforce and indicated to CMFG representatives that the Policy was under review for potential fraud. *Id.* ¶ 38. The Fraud

Note stated that any calls concerning the Policy should be transferred to "a Senior for handling." *Id.* ¶ 39 (internal citation omitted).

On or around August 5, 2019, CMFG obtained a public records report on Green. *Id.* ¶ 40. The Nottingham Way address and the phone number provided on the Application were not listed on the report. *Id.* ¶¶ 41–42. The next day, CMFG entered a fraud alert (the "Fraud Alert") with respect to the Policy into a database that CMFG uses to maintain policy-related documents. *Id.* ¶ 43. Like the July Fraud Note, the August Fraud Alert stated that the "policy is currently being reviewed" by CMFG. *Id.* ¶ 44 (internal citation omitted). The Fraud Alert directed call center representatives that if a customer asked why CMFG was not able to process requests over the phone, the representative should advise the customer, among other things, that the policy at issue "is currently being reviewed as part of an internal data security process." *Id.* ¶ 45 (internal citation omitted). CMFG did not inform Green or Vlado that an internal review was being conducted on the Policy before Green's death. *Id.* ¶ 46.

In mid-August 2019, CMFG obtained another set of public record reports on Green. *Id.* ¶ 47. Then in February 2020, CMFG obtained the results of a database "person search" on Green. *Id.* ¶ 50. Neither report listed the Nottingham Way address or phone number provided in the Application. *Id.* ¶¶ 48–49, 51. Nonetheless, in 2020, CMFG found that there was "no basis for recission" of the Policy, noting, among other things, that the date of birth and social security number on the Policy matched Sally Green. ECF No. 92-4 at 1296–97.[1]

According to Plaintiff, CMFG did not request Green's medical records during this investigation, but did so for other comparable policies suspect of fraud. ECF No. 99 ¶¶ 58–61.

---

[1] Unless otherwise indicated, citations refer to the last several digits of the relevant Bates page number.

Specifically, a Fraud Ring Report to the New Jersey state department, listing the Policy and 39 others suspected of fraud, demonstrates that CMFG requested medical information from some applicants involved, but not the one at issue here. *Id.* ¶¶ 59–60; ECF No. 86-15, rows 9 (column Z), 108 (column Z).

During this time, Plaintiff attempted to contact CMFG representatives regarding a payment issue. ECF No. 96-19 at 2–3. Plaintiff alleges that she was told the problem was attributable to a "payment system [no]t working," and was not informed that the issue had anything to do with the fraud alert then in place. *Id.* at timestamps 1:31, 4:40. Plaintiff claims that CMFG agents made virtually identical misrepresentations to another related policyholder. ECF No. 99 ¶¶ 55–56.

### C. Investigation and Denial of Vlado's Claim for Benefits

On December 26, 2022, Green died from cardiorespiratory arrest. JSMF ¶ 52. Soon after, CMFG received a notice of claim for the Policy's death benefit from Vlado. *Id.* ¶ 53. Following Vlado's submission of her claim, CMFG referred the claim to their Special Investigations Unit based on the August 2019 Fraud Alert on the Policy. *Id.* ¶¶ 54, 56. Vlado states that for weeks thereafter, CMFG falsely informed Vlado that it was performing a routine review of the Policy despite knowing the Policy was under review for fraud. ECF No. 99 ¶ 67 (citing ECF No. 98-5 at timestamp 1:16; ECF No. 98-4 at timestamp 8:08; ECF No. 98-6 at timestamp 1:11).

Because the Policy was outside the two-year contestability period at the time of Green's death, CMFG did not immediately request a HIPAA authorization form that would allow CMFG to access Green's medical records. JSMF ¶ 55. CMFG did eventually obtain these records, reviewing these records alongside its electronic data related to the Policy and the personal identifying information in the Application. *Id.* ¶ 58.

Green's medical records showed that the representations on the Application regarding her health and medical condition were false. Specifically, the records show that Green had a heart attack in 2015, contrary to the representation that Green had not been treated for or diagnosed with a Heart Disease/Condition in the five-year period before the Application. *Id.* ¶ 65. Green's records also show that she was diagnosed with Chronic Obstructive Pulmonary Disease, contrary to representations that she had not been treated for diagnosed with a Chronic Lung Condition in the five-year period before the Application. *Id.* ¶ 66. Green had a history of smoking, contrary to representations that she had not used any nicotine substances or substitutes in the last 12 months before the Application.[2] *Id.* ¶ 67. Green had a 2015 aneurysm that resulted in a clip and coils being placed in Green's brain, contrary to representations that she had not been treated for or diagnosed with a Chronic Disorder of the Brain in the five-year period before the Application. *Id.* ¶ 68. Contrary to representations in the Application, Green also had a stroke in the five-year period before the Application. *Id.* ¶ 69. CMFG has Underwriting Guidelines under which CMFG would have declined the Application for any one of these medical facts. *Id.* ¶ 70.

CMFG also looked into the electronic data and personal identifying information on the Application. Vlado represents that she was at the Nottingham Way address on August 25, 2018, and that Green completed at least part of the Application at the address. *Id.* ¶ 72. Vlado represents that a childhood friend, Cynthia Petro, was visiting on or around August 25, 2018, to help Green with the Application. *Id.* ¶ 73. CMFG's electronic data indicates that the Application

---

[2] Vlado represents that she knew Green had "smoked in the past," but that to her, Green was a "nonsmoker." ECF No. 98-1 at 120:3–12. "To my knowledge," Vlado testified, she was "not aware" that Green was a smoker. *Id.* at 166:7–10. CMFG asserts that Vlado's long-term residency with Green makes it likely that Vlado concealed Green's smoking history, but Vlado lived with her children and cared for her grandchildren. ECF No. 98-1 at 15:9–25, 22:16–24:21; ECF No. 104-68.

was submitted from West Orange, New Jersey, which is about 80 miles away from the listed Nottingham Way address. *Id.* ¶ 73. Data also places Green's cellphone in Forked River, New Jersey, twenty-two minutes after the Application was electronically submitted. *Id.* ¶ 75. Forked River is over an hour from the Nottingham Way address and West Orange. *Id.* However, Green's phone data shows calls placed between her phone and Vlado's phone on August 22, 23, 25, 2018, as well as multiple calls between the numbers on August 26 and 27, 2018, and one call on August 28, 2018. *Id.* ¶ 77.

CMFG also discovered a September 2022 complaint filed by a different life insurance company, Lumico, against Green and Vlado's sibling, Archie. *Id.* ¶ 59; ECF No. 103 ¶ 2.42. Lumico alleged that it was fraudulently induced to issue a separate life insurance policy on Green's life. *Id.* On February 3, 2023, CMFG entered a claim note indicating that Lumico had voluntarily dismissed this action. *Id.* ¶ 60.

Around April 2023, CMFG denied Vlado's claim for benefits on the grounds that the Policy was procured based on fraudulent misrepresentations. *Id.* ¶ 61. CMFG states that Policy was likely not applied for by Green or with her consent, and that "there appears to be some medical information that was misrepresented in the Application." *Id.*; *see* ECF No. 96-2 at ¶¶ 13–14, 16. CMFG offered to return the premiums paid on the Policy. JSMF ¶ 61. CMFG notified Vlado of its claim determination by phone (because Vlado had been calling CMFG to obtain a status update) and did not send a written explanation before Vlado initiated litigation. *Id.* ¶ 63.

## II.    Procedural History

On April 18, 2023, Vlado filed a complaint against CMFG seeking damages for breach of contract stemming from CMFG's denial of Vlado's claim (Count I). ECF No. 1 ¶¶ 17–26. Vlado

also seeks a declaratory judgment that the policy is valid and injunctive relief compelling CMFG to pay the death benefit under the Policy to Vlado (Count II). *Id.* ¶¶ 27–35.

On June 7, 2023, CMFG answered Vlado's complaint, pleading affirmative defenses, including that someone other than Green completed the Application, procured the Policy without the Insured's knowledge and consent, and that the Application contained fraudulent and material misrepresentations. ECF No. 11 at 7–9. CMFG seeks a judgment declaring the Policy void and asserts a counterclaim against Vlado seeking monetary damages pursuant to the New Jersey Insurance Fraud Prevention Act ("IFPA"). *Id.* at 13–14.

On June 30, 2023, Vlado moved to dismiss CMFG's counterclaim and strike several of CMFG's affirmative defenses because of the incontestability clause of the Policy. ECF No. 12. The Court subsequently ruled that New Jersey's incontestability statute does not bar most of CMFG's affirmative defenses. ECF No. 22 at 7. The Court also permitted CMFG to proceed with its counterclaim under the IFPA. *Id.*

After discovery progressed, Vlado filed the Amended Complaint, the operative complaint, on October 30, 2023. ECF No. 34. Based on information procured during discovery, the Amended Complaint includes a third count for fraud, a fourth count for violation of the New York General Business Law, and a fifth count for violation of the New Jersey Consumer Fraud Act. *Id.* ¶¶ 67–93.

In September 2024, the parties filed cross-motions for summary judgment. ECF Nos. 90, 100. The parties also seek to seal certain exhibits filed in connection with the summary judgment papers. ECF No. 85.

## LEGAL STANDARD

In considering cross-motions for summary judgment, a court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Jingrong v. Chinese Anti-Cult World All. Inc.,* 16 F.4th 47, 56 (2d Cir. 2021) (citing *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)). To prevail on a motion for summary judgment, a movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp.*, 477 U.S. at 322. When the movant properly supports her motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing "particular parts of materials in the record" to survive the summary judgment motion. FED. R. CIV. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "Only disputes over facts that might affect the outcome of the suit under the governing law" preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quoting *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997)).

## DISCUSSION

This section proceeds in five parts. First, the Court examines Vlado's breach of contract and declaratory judgment claims and finds that the medical misrepresentation defense bars Vlado's claims. Second, the Court denies summary judgment on the IFPA claim. Third and

fourth, the Court finds that Vlado has not shown sufficient evidence to proceed on the fraud and consumer fraud claims under either New Jersey or New York law. And finally, the Court grants the motion to seal particular documents.

## I.    Plaintiff's Breach of Contract and Declaratory Judgment Claims Do Not Survive Summary Judgment

Vlado and CMFG cross-move for summary judgment on Vlado's breach of contract and declaratory judgment claims. The disposition of these claims turns on the applicability of the Policy's incontestability clause. The incontestability clause of the Policy states:

> This policy is incontestable after it has been in force during the Insured's lifetime for two years from the effective date or reinstatement date. Statements made in the application or reinstatement application will not be used by us to void your policy or challenge a claim, unless the statement is material, is contained in your application that is attached to your policy, and within the contestable period.
>
> After this 2-year period, we cannot contest coverage except for: a) Non-payment of premiums; or b) Fraud in the procurement of the policy or reinstated period, if permitted by applicable law in the state where the policy is delivered.

ECF No. 96-11 § 8.02. The two-year period has passed, and moreover, CMFG has received all required premium payments owed under the Policy. JSMF ¶ 25. To contest the policy, CMFG must do so for fraud in the procurement of the Policy to the extent permitted by New Jersey law.[3] CMFG asserts two defenses: material medical misrepresentation and the imposter defense.

The Court determines that the undisputed facts render the material medical misrepresentation defense dispositive here.

### A.  New Jersey Law Recognizes a Medical Misrepresentation Defense Against Incontestability Clauses, and the Defense Applies Here

The Court previously addressed whether New Jersey law permits insurance companies to void a policy for fraudulent misrepresentation. *See* ECF No. 22 ("Op.") at 7–15. In doing so, the

---

[3] Both parties appear to agree that New Jersey law applies. *See* ECF Nos. 91 at 11–13, 97 at 17–22.

Court performed analyses of the New Jersey Incontestability Statute, the fraud exception outlined in *Ledley v. William Penn Life Insurance Company*, 138 N.J. 627 (1995), Vlado's counterarguments regarding the stranger initiated life insurance policy ("STOLI") exception to incontestability found in *Sun Life Assurance Company of Canada v. Wells Fargo Bank, N.A.,* 208 A.3d 839 (N.J. 2019), and the Insurance Fraud Prevention Act ("IFPA"). *See id.* The Court ultimately determined that *Ledley* is likely the applicable law of New Jersey. *Id.* at 15. And *Ledley* states unambiguously that "a misrepresentation about the applicant's state of health is material as a matter of law, and proof of the falsity of the misrepresentation will allow the defrauded party to void the [insurance policy]." *Ledley*, 138 N.J. at 642.

Although Vlado attempts to relitigate the application of *Ledley* to her case, Vlado raises no arguments that warrant reconsideration. Vlado asserts that New Jersey law precludes CMFG from contesting the Policy based on medical misrepresentations, but cites only to cases that predate *Ledley.* ECF Nos. 97 at 17–20; 101 at 19–23. In doing so, Vlado characterizes the Court's prior opinion as finding that *Ledley*'s assertions qualify as dicta and have no application beyond resolving unsettled interpretation of state law. ECF No. 97 at 19. To the contrary, the Court determined that although *Ledley's* assertions may be dicta, "[i]t is unnecessary to engage in involved speculation regarding how a state's highest court would likely rule when it has already spoken unambiguously on the issue." ECF No. 22 at 9. In arriving at this conclusion, the Court examined how, even though other courts have noted that *Ledley* possibly misapplied New Jersey precedent, these courts were ultimately persuaded that *Ledley* represents New Jersey law. *Id.* at 8. The Court also considered the consistency of *Ledley* with the IFPA, a law enacted in 1983, which post-dates the majority of New Jersey precedent prohibiting contestation based on medical misrepresentations. *Id.* at 11–12. Against these reasons for giving *Ledley* controlling effect,

12

Vlado's reliance on pre-*Ledley* case law regarding medical misrepresentations and incontestability are unpersuasive.

The Court now reiterates that *Ledley* is controlling here. "[A] misrepresentation about the applicant's state of health is material as a matter of law, and proof of the falsity of the misrepresentation will allow the defrauded party to void the [insurance policy]." *Ledley*, 138 N.J. at 642.

### B.  The Medical Misrepresentation Defense Bars Vlado's Claims

Here, it is beyond dispute that the Green Application made material medical misrepresentations about Green's medical history. In the parties' joint submission of facts, both agree that Green's medical records showed that the representations on the Application regarding her health and medical condition were false. Specifically, the records show that Green had a heart attack in 2015, contrary to the representation that Green had not been treated for or diagnosed with a Heart Disease/Condition in the five-year period before the Application. JSMF ¶ 65. Green's records also show that she was diagnosed with Chronic Obstructive Pulmonary Disease, contrary to representations that she had not been treated for diagnosed with a Chronic Lung Condition in the five-year period before the Application. *Id.* ¶ 66. Green had a history of smoking, contrary to representations that she had not used any nicotine substances or substitutes in the last 12 months before the Application. *Id.* ¶ 67. Green had a 2015 aneurysm that resulted in a clip and coils being placed in Green's brain, contrary to representations that she had not been treated for or diagnosed with a Chronic Disorder of the Brain in the five-year period before the Application. *Id.* ¶ 68. Green also had a stroke in the five-year period before the Application, contrary to representations in the Application. *Id.* ¶ 69. Also, it is beyond dispute that these misrepresentations were material: CMFG has Underwriting Guidelines under which CMFG would have declined the Application for any one of these medical facts. *Id.* ¶ 70.

Vlado argues that CMFG's knowledge of and failure to investigate misrepresentations prohibits CMFG from asserting this defense. Indeed, although New Jersey law holds a fraud exception to incontestability clauses, the same law appears to bar the application of that exception where the insurance company had reason to but failed to discover the fraud within the contestability period. This prohibition can be found in the dicta of *Ledley* and *Strawbridge,* as well as in the principles of waiver and ratification.

To begin, New Jersey case law suggests that the interpretations of the incontestability clauses must be mindful of its purpose to "encourage[e] insurers to be diligent and alert by prescribing a time period after which the insured must relinquish its right to contest the validity of a policy." *Strawbridge v. New York Life Ins. Co,* 504 F. Supp. 824, 829 (D.N.J. 1980). "The clause does not condone fraud, but allows an adequate period for the insurer to discover fraud and protect its rights." *Id.* In *Ledley,* the Court applied this principle and considered whether the insurance company had a duty to further investigate the misrepresentation during the contestability period. 138 N.J. at 639. The *Ledley* court found that "[a]n insurer's duty to investigate further arises 'only when the independent investigation . . . discloses sufficient facts to seriously impair the value' of the application." *Id.* (quoting *Gallagher v. New Eng. Mut. Life Ins. Co.*, 19 N.J. 14, 22 (1955)) (ellipsis in original). However, "the mere fact that an insurer makes an investigation does not . . . lessen the right of the insurer to rely upon [her] statements, unless the investigation discloses facts sufficient to expose the falsity of the representations" or the facts are "of such a nature as to place upon the insurer the duty of further inquiry." *Id.* (quoting *John Hancock Mut. Life Ins. Co. of Boston v. Cronin*, 139 N.J. Eq. 392, 398 (1946)).

Principles of waiver and ratification also limit the applicability of fraud defenses. New Jersey has found that as a general matter of contract law, when a party has discovered a fraud or

"has been informed of facts and circumstances from which such knowledge would be imputed," that party must "thereupon act with diligence and without delay if he desires to rescind[.]" *Ajamian v. Schlanger*, 20 N.J. Super. 246, 249 (App. Div. 1952). Otherwise, the "transaction will be deemed ratified if he does any material act which assumes the transaction is valid." *Id.* Similarly, a waiver "can be found if the conduct of the insurer after information of fraud . . . is such as to justify an interference of affirmation rather than recission of the contract." *Bonnet v. Stewart,* 68 N.J. 287, 294 (1975).

Plaintiff has failed to come forward with any admissible evidence that CMFG knew of, or had adequate reason to know of, the Application's medical misrepresentations within the contestability period. The record does not indicate that, during the contestability period, the Green Application or any individuals involved provided facts to CMFG suggesting a possible medical misrepresentation. Instead, what the evidence shows is that during the contestability period, CMFG suspected and investigated a possible imposter in the Application. In 2019, CMFG advised the New Jersey government that the personal identifying information in the Application was suspected to be fraudulent, JSMF ¶¶ 31–32, issued a fraud note on the Policy, *id.* ¶ 37, and placed a fraud note on the Policy, *id.* ¶ 43. CMFG also obtained multiple public records reports on Green between 2019 and 2020, each reflecting that the address and phone number provided on the Application was not associated with Green herself. *Id.* ¶¶ 40–42, 47–51. However, none of these alerts suggested *medical* misrepresentation. And ultimately, after CMFG confirmed that the social security number and date of birth belonged to Ms. Green, CMFG's investigation determined that there was "no basis for rescission" of the policy. ECF No. 92-4 at 1296.

Vlado argues that CMFG should have suspected medical misrepresentations by pointing to a CMFG spreadsheet listing comparable policies suspected of fraud. ECF No. 99 ¶¶ 58–61. This spreadsheet lists the Policy and 39 others suspected of fraud in the New Jersey state department Fraud Ring Report. *Id.* ¶¶ 59–60; ECF No. 86-15. The spreadsheet demonstrates that CMFG requested medical information from two applicants involved. ECF No. 86-15, rows 9 (column Z), 108 (column Z). But the spreadsheet does not indicate the two applicants' medical information demonstrated that they engaged in material misrepresentations. Based on the fact that medical information was merely *requested* from only two other applicants, Vlado asks the Court to find a genuine dispute of fact over whether CMFG should have also suspected that the Policy contained material medical misrepresentations. Even drawing all permissible inferences in favor of Vlado, the Court sees no genuine dispute based on the available evidence that CMFG had reason to suspect medical misrepresentation in this Policy. And "when the insured materially misrepresents his or her health, the insurer, in the absence of knowledge of conflicting facts, does not have a duty to investigate independently of the insured's medical history." *Mitchell v. Banner Life Ins. Co.*, No. 08-CV-5984 (JLL), 2011 WL 5878378, at *6 (D.N.J. Nov. 22, 2011) (alteration adopted) (quoting *Ledley*, 138 N.J. at 631)).

The Court concludes that CMFG has stated the material medical misrepresentation defense as a matter of law. Vlado's breach of contract and declaratory judgment claims are therefore dismissed.

## II.    Genuine Dispute of Material Fact Remains Over CMFG's IFPA Counterclaim

The IFPA provides a cause of action for insurers against a person who:

> [p]resents or causes to be presented a written or oral statement as part of, or in support of or in opposition to, a claim for payment or other benefit pursuant to an insurance policy . . . knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim[.]

N.J. STAT. ANN. § 17:33A-4(a)(1).

CMFG contends that Vlado's initiation of this lawsuit contained such false statements, including statements that Green had completed the Application and some inaccurate statements about Green's medical history. ECF No. 91 at 9–11. Vlado argues that New Jersey's incontestability law, imposing a two-year limit on the contestability of insurance policies, preempts the IFPA's six-year statute of limitations; that CMFG's failure to comply with the IFPA warrants dismissal; and that the record does not substantiate the IFPA claim. ECF No. 101 at 23–30. The Court rejects Vlado's legal arguments, but concludes that genuine issues of material fact preclude summary judgment in CMFG's favor.

## A. New Jersey's Incontestability Law Does Not Preempt the IFPA

New Jersey's incontestability statute, Section 17B:25-4, precludes insurers from belatedly attacking life insurance policies outside of the two-year contestability period. *Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.,* 238 N.J. 157, 168 (2019). By contrast, the IFPA addresses the insurance industry generally and imposes a six-year limitations period for claims of insurance fraud. N.J. STAT. ANN. §§ 17:33A-7(a), (e). Vlado contends that under canons of statutory interpretation, the two-year limit under the incontestability statute should preempt the IFPA's six-year limitations period. ECF No. 101 at 23–25.

But the Court finds this unavailing. To allow a fraud defense against the incontestability clause—while reading an IFPA claim as prohibited by an incontestability clause—would be grossly inconsistent. In fact, in concluding that New Jersey law permits fraud defenses against the incontestability clause, this Court explicitly analyzed the role of the IFPA's enactment and New Jersey's shift toward broad remedial goals against fraud. *See* Op. at 11–12. Because fraud can be asserted as a defense against the contestability clause, it follows that claims under the

IFPA are not restricted by the two-year limit of the incontestability statute. *See Lincoln Nat. Life Ins. Co. v. Schwarz,* No. 09-CV-03361 (FLW), 2010 WL 3283550, at *16 (D.N.J. Aug. 18, 2010) (noting that the IFPA's provisions should be "liberally construed to accomplish the Legislature's broad remedial goals." (internal citation omitted)).

### B.  Procedural Non-Compliance Does Not Warrant Dismissal

Vlado contends that CMFG's failure to comply with the "government notice" requirements in the IFPA when initiating the counterclaim warrants dismissal. ECF No. 101 at 26–28. The applicable provision states that "[a] claimant under this section shall mail a copy of the initial claim, amended claim, counterclaims, briefs and legal memoranda to the commissioner at the time of filing such documents with the court wherein the matter is pending. A successful claimant shall report to the commissioner . . . the amount recovered . . . ." N.J. STAT. ANN. § 17:33A-7(c). There is nothing in the language of this provision that indicates that asserting an IFPA claim is dependent on first providing notice. And in any event, CMFG has since complied with this notice requirement, which Vlado does not contest. *See* ECF Nos. 105 at 15, 109 at 10 n.10.

This language is distinguishable from that of other New Jersey statutes with notice prerequisites where courts have dismissed claims for failing to provide the applicable notice. For example, in *Scott v. E.I. DuPont de Nemours & Co.*, the court concluded that the plaintiff could not bring action where it failed to comply with the New Jersey Environment Rights Act's advanced notice provision. No. 06-CV-3080 (RMB), 2009 WL 901135, at *3–4 (D.N.J. Apr. 1, 2009). The language in that act specifies that "no action may be commenced" unless notice is provided to the applicable government agency. *Id.* at *2. (cleaned up). The IFPA does not include such language. The IFPA references legal briefs and the amount a claimant recovers, indicating

that notice is not a prerequisite to bringing suit. Moreover, the purpose of this notice requirement

is to permit the New Jersey government commissioner to join in the action if so desired. N.J.

STAT. ANN. § 17:33A-7(d). Vlado does not offer any case law suggesting that a failure to timely

comply with the notice requirement—particularly when remedied at a later date—is a basis to

dismiss a cognizable claim. Nor does Vlado show how she suffered prejudice from the temporary

non-compliance.

### C.  The Record Is Insufficient to Grant Summary Judgment

To prove an IFPA claim on summary judgment, CMFG must show "(1) knowledge, (2)

falsity, and (3) materiality" on Vlado's part. *Horizon Blue Cross Blue Shield of New Jersey v.*

*Transitions Recovery Program*, No. 10-CV-3197 (RBK) (KMW), 2015 WL 8345537, at *4

(D.N.J. Dec. 8, 2015). "Unlike common law fraud, proof of fraud under the IFPA does not

require proof of reliance on the false statement or resultant damages . . . nor proof of intent to

deceive." *Id.* (ellipsis in original) (quoting *Lincoln Nat. Life Ins. Co. v. Schwarz*, No. 09-CV-3361

(FLW), 2010 WL 3283550, at *16 (D.N.J. Aug. 18, 2010)).

Here, the evidence is insufficient to show beyond dispute that Vlado knowingly made

material and false statements. CMFG contends that Vlado's fraudulent statements include her

representations about how and where the Application was filed, about who filed the Application,

and about Green's medical history.

First, on the filing of the Application, there does appear to be some dispute over how and

where the Application was filed and who filed it. Vlado represents that she was at the

Nottingham Way address on August 25, 2018, and that Green completed at least part of the

Application at the address. JSMF ¶ 72. Vlado represents that a childhood friend, Cynthia Petro,

was visiting on or around August 25, 2018 to help Green with the Application. *Id.* ¶ 73. But to

the contrary, CMFG's electronic data indicates that the Application was submitted from West Orange, New Jersey, which is about 80 miles away from the listed Nottingham Way address. *Id.* Data also places Green's cellphone in Forked River, New Jersey, at twenty-two minutes after the Application was electronically submitted. *Id.* ¶ 75. Forked River is over an hour from the Nottingham Way address and West Orange. *Id.*

Despite these inconsistencies, data also shows that Green and Vlado's numbers exchanged calls on August 22, 23, 25, 2018, as well as multiple calls between the numbers on August 26 and 27, 2018, and one call on August 28, 2018. *Id.* ¶ 77. It is entirely conceivable that Vlado and Cynthia Petro assisted Green with the filing of her application over the course of days or hours—and that Green herself ultimately authorized the submission of the Application. In that case, Vlado's statement that Green partially completed the application at the Nottingham Way address would not be false. And to the extent that Vlado's statements are not perfectly consistent with how events occurred years ago, the inconsistencies would not be material. Thus, the Court cannot find that Vlado's statements regarding the Application warrant summary judgment on the IFPA claim.

Second, on the medical statements, a reasonable jury can find that deposition testimony and admissions by Vlado show that Vlado made untrue statements about Green's medical history. *Compare* ECF No. 98-1 at 120:3–12; 166:7–10 *with* JSMF ¶ 67. Specifically, Green had a history of smoking, and Vlado represented that she knew Green "smoked in the past," but that to her, Green was a "nonsmoker" and that "to [her] knowledge," she was "not aware" that Green was a smoker. *Id.* However, while CMFG asserts that Vlado's long-term residency with Green makes it likely that Vlado concealed Green's smoking history, Green's medical records also indicate that Green had a low to moderate nicotine dependence and that she had no trouble

refraining from smoking. ECF No. 104-68. Moreover, Vlado lived with her children and cared

for her grandchildren. ECF No. 98-1 at 15:9–25; 22:16–24:21. A reasonable jury may determine

that Green did not smoke in Vlado's presence and that Vlado's representations were not

knowingly false.

Regarding the Application's other medical misrepresentations, CMFG has not offered

sufficient evidence to show that Vlado herself was involved in the completion of the Application

or that she knew anything about the medical representations made therein. Based on this record,

the Court cannot grant summary judgment on the IFPA claim for medical misrepresentations.

### III.    Plaintiff's Fraud Claim Does Not Survive Summary Judgment

Vlado brings a claim for common law fraud, which CMFG seeks to dismiss. The parties

agree that it does not matter whether New York or New Jersey law is applied because the two are

identical. *See* ECF No. 97 at 28 n.11 and ECF No. 91 at 18.

There is, however, some ambiguity about whether CMFG is moving for summary

judgment or under Rule 12 to dismiss this claim. *See, e.g.*, ECF No. 97 at 22–28 (discussing the

sufficiency of allegations rather than the sufficiency of the evidence). However, the Court applies

a summary judgment standard to this portion of the motions for four reasons. First, both parties

refer to their motions as motions for summary judgment. ECF Nos. 90, 91, 100, 101. Second,

Defendants have already answered the Amended Complaint, and there is no indication that

Defendants are seeking a judgment on the pleadings. ECF No. 39. Third, discovery is complete,

meaning that summary judgment is the appropriate standard. *See Lugo v. City of Troy, New York*,

114 F.4th 80, 89 (2d Cir. 2024) (noting that "[w]hen a district court resolves a summary-

judgment motion as a pleadings motion, it disregards the more robust procedural device the

parties have invoked to frame the issue and thus unjustifiably ignores the fuller evidentiary

record assembled by the parties" (cleaned up)). And finally, Vlado appears to acknowledge that CMFG is moving under a summary judgment standard and responds as such, including by coming forward with evidence in support of her claim. ECF No. 97 at 22. As such, there is no prejudice to Vlado in construing this motion as one for summary judgment.

CMFG first seeks to dismiss the fraud claim by arguing that Vlado must prove that CMFG had a duty to disclose concealed information to her. ECF No. 91 at 18–19. That is true if Vlado is asserting a claim for fraudulent concealment. The elements of a fraudulent concealment claim are "(1) a duty on behalf of the defendant to disclose to the plaintiff a material fact; (2) the failure to disclose that fact; (3) an intention to defraud or deceive the plaintiff; (4) action taken by the plaintiff in justifiable reliance on the concealment; and (5) damages as a result of the defendant's concealment." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., & Prods. Liab. Litig.*, 553 F. Supp. 3d 211, 230–31 (D.N.J. 2021) (internal citation omitted). But Vlado states that she is instead bringing a claim for fraud. The elements of common law fraud are: "(1) a false representation (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the misrepresentation." *Id.* (internal citation omitted).

In either case, however, there is insufficient evidence for Vlado to proceed on the fraud claim. Vlado alleges that CMFG actively concealed information about fraud alerts in an attempt to induce Vlado and other consumers to keep making policy payments. To support this allegation, Vlado relies on phone records in which CMFG employees did not inform Vlado that a fraud alert had been placed on her account. Specifically, Vlado states that she attempted to contact CMFG representatives regarding a payment issue. ECF No. 96-19 at 2–3. She was told the problem was attributable to a "payment system [no]t working," and was not informed that the

issue had anything to do with the fraud alert then in place. *Id.* at timestamps 1:31, 4:40. Vlado also claims that CMFG agents made virtually identical misrepresentations to another related policyholder. ECF No. 99 ¶¶ 55–56.

Even drawing all reasonable inferences in Vlado's favor, these omissions fall far short of the fraud standard. As an initial matter, Plaintiff has come forward with no evidence that CMFG had determined the policy was fraudulent, such that the representative made a false statement by omitting reference to fraud. Indeed, it is undisputed that at the time, CMFG found that there was "no basis for recission" of the policy. ECF No. 92-4 at 1296. Furthermore, Vlado has offered no evidence showing that CMFG omitted details about the fraud alert to deceive Vlado for the purpose of inducing her continued payments. Relatedly, there is no evidence to show CMFG wanted to induce continued payments from fraudulent customers. To the contrary, it is undisputed that CMFG offered to return the premiums paid on the Policy by Vlado. JSMF ¶ 61.

As such, the limited evidence with respect to this claim fails to raise a genuine issue of material fact about whether CMFG engaged in fraud. The common law fraud claim fails as a matter of law.

## IV. Plaintiff's Consumer Fraud Claim Does Not Survive Summary Judgment

Vlado brings consumer fraud claims under New Jersey and New York law.

A claim under Section 349 of the New York's General Business Law ("Section 349") "must be predicated on a deceptive act or practice that is consumer oriented." *Amalfitano v. NBTY Inc.*, 9 N.Y.S.3d 352, 354 (2d Dep't 2015) (citing *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 344 (1999)). "In addition to showing that the conduct was consumer oriented, a prima facie case requires . . . a showing that the defendant is engaging in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof."

*Id.* (cleaned up). "Consumer-oriented" acts and practices may be acts that are "repetitive or . . . capable of repetition." *Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 774 (2d Dep't 1995). Such acts also include conduct that is "part of a pattern of conduct that was not unique to plaintiff, but was directed at their policyholders generally." *JD & K Assocs., LLC v. Selective Ins. Grp., Inc.*, 988 N.Y.S.2d 749, 751 (4th Dep't 2014).

Under the New Jersey Consumer Fraud Act ("NJCFA"), a plaintiff must establish a consumer transaction, unlawful conduct by the defendant, an ascertainable loss by the plaintiff, and a causal relationship between the two. *Hobson v. Hartford Ins. Co. of the Midwest,* No. 21-CV-20696 (EP), 2022 WL 4536470, at *3 (D.N.J. Sept. 28, 2022). "Affirmative acts of fraud require no showing of intent on behalf of the defendant." *Szczubelek v. Cendant Mortg. Corp.*, 215 F.R.D. 107, 125 (D.N.J. 2003). "In contrast, when the alleged consumer fraud consists of an omission, a plaintiff must show the defendant acted with knowledge, thereby making intent an essential element of the fraud." *Id.*

For all the reasons stated in the preceding discussion on Vlado's fraud claims, Vlado has failed to put forth sufficient evidence of wrongdoing on CMFG's part through the phone communications. CMFG's decision to not inform Vlado of a fraud alert in 2020, particularly when CMFG found "no basis for recission" of the Policy at the time, is not unlawful conduct. Moreover, after CMFG confirmed that there is "no basis for recission" of the Policy, there is no evidence that CMFG, in 2020, had any reason to further suspect Vlado of fraud. Vlado's consumer fraud claims are dismissed.

## V.    The Motion to Seal Is Granted

The parties moved jointly to file several documents under seal as confidential business information, including documents on CMFG's underwriting guidelines, CMFG's internal

systems and data for a variety of business matters, information regarding insureds whose policies are not at issue, CMFG's fraud investigation practices and reporting, and confidential communications with the New Jersey government. ECF No. 85. "[C]ourts in this District routinely permit parties to seal or redact commercially sensitive information in order to protect confidential business and financial information." *See In re B & C KB Holding GmbH,* No. 22-MC-180 (LAK) (VF), 2023 WL 2021299, *1 (S.D.N.Y. Feb. 14, 2023) (collecting cases). Accordingly, the joint motion is granted. Documents temporarily sealed by the order at ECF No. 87 shall remain sealed.

## CONCLUSION

For the foregoing reasons, CMFG's motion for summary judgment is GRANTED in part and DENIED in part and Vlado's motion for partial summary judgment is DENIED. By **October 29, 2025**, the parties shall file a joint letter regarding proposed next steps in this action. The letter shall include whether the parties are interested in being referred to the Court's Mediation Program or to the Magistrate Judge for a settlement conference. Also, assuming the parties still intend to litigate the one remaining claim in this action, the parties shall provide their availability for trial in February, March and April.

The Clerk of Court is directed to terminate ECF Nos. 90 and 100.

Dated:  September 30, 2025
        New York, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge